The prisoner was convicted of murder in the second degree of Eunola Seamon. The prisoner had been convicted of bigamy in marrying the deceased and was sentenced to the Virginia penitentiary. *Page 506 
On his return after being pardoned, he found that his wife had obtained a divorce. He then offered to remarry Eunola, which she declined, and subsequently married Seamon. The two children of his marriage with Eunola were in his custody. The prisoner fiercely resented the marriage of the deceased to Seamon, and on several occasions avowed his intention to kill one or both of them. In August, 1909, the deceased went to the house of one Lane, where the prisoner lived, and took one of her children, about two and one-half years old, and carried it to the place where she lived, one-half mile away. Upon hearing this, the prisoner procured a pistol and saying he did not intend to use it unless it was absolutely necessary, put it in his breast pocket. On arriving at Toleson's house where the deceased lived, he went around to the back porch, where he found Seamon, the husband of the deceased, whom he shot twice; the deceased grabbed up the child with her left arm, followed by the prisoner, who was on her (621) right side. He fired at her once; she fell. She held to the child which he attempted to take from her, but she still clung to it, whereupon he fired upon her a second time while down on the floor.
The first exception was because the court ruled out a question by the prisoner to the coroner, whether from the course of the ball after it struck the body could the shot have been made while the parties were both standing. The witness was not an expert, and the question was properly excluded. Besides, the prisoner admits that he killed the woman with a deadly weapon. There is no suggestion that he shot in self-defense, and if he shot in defense of the child it does not appear that the position of the parties could have any bearing upon the case. The suggestion that he had a right to slay the mother because she would not surrender her child is an aggravation and not a defense. He testified that he told her to turn loose the child; that she said that she did not intend to do so; and that he fired to make her release the child. He says that the child was turning black in the face, and that the mother was holding to the child when she fell. The second shot was fired while she was on the floor, and he said he did not intend to hit her, but to frighten her so that she would release the child. It is not clear which ball was fatal, though both struck her, the pistol being so close to her body that the clothing was scorched. The prisoner having admitted that the killing was done with a deadly weapon, and no excuse appearing, he was guilty at least of murder in the second degree. S. v. Fowler, 151 N.C. 731.
The second exception is to the refusal of court to allow the prisoner to testify that he carried a pistol that day because on a former occasion, when the deceased and Seamon started to carry away the children, that *Page 507 
Seamon drew a pistol on him, and that he did not intend to use a pistol on this occasion unless necessary. The testimony was properly excluded, because: 1. The prisoner was not on trial for shooting Seamon. 2. The procuring of the pistol was prejudicial only if it tended to show deliberation and premeditation, and the prisoner has been acquitted of murder in the first degree.
The third exception is disposed of by what is said in regard to the second exception. As to the fourth exception the question as to the expert was properly excluded because it did not present to (622) the expert all the vital facts in the case, in the absence of which his opinion could not have any value upon the query whether the prisoner had sufficient mind at the time to understand what he was doing and to know whether he was doing right or wrong. The question did not recite that in July before, the prisoner had said that the deceased could not see so much pleasure and that he was going to kill her; that two weeks before the killing he said if she ever came back to Roanoke Island he would kill her; that on Sunday before the shooting he repeated the declaration; that on Wednesday before the shooting he said he was going to Elizabeth City to kill the deceased and Seamon; that when he got the pistol he said he was not going to use it if he could possibly avoid doing so; that he said he put the pistol in his vest pocket because he was afraid it would fall out of his hip pocket while he was running; that he said he shot Seamon because the latter put his hand to his hip pocket, and made a break at him; and that he had just testified on the witness stand that he shot the woman, not intending to kill her, but because he wanted to make her release the child. All these were vital facts and the expert could not give an opinion of any value as to the mental condition of the prisoner, at the time of the killing, upon a hypothetical recital of facts, which omitted these material circumstances. The hypothetical question must be so framed as to fairly reflect the material facts, either admitted or proved. Lawson Expert Ev., Rule 42 (2). As is well said by Chitty Med. Jur., "The opinion of an expert on half the facts of the case on which the jury are to decide must be utterly worthless, for it may well be that the same witness with all the facts before him would pronounce a very different opinion." InBurgo v. State, 26 Neb. 642, the Court says: "The necessity that the question shall fairly reflect the facts proved or admitted, where it is sought to show insanity as an excuse for crime, is apparent. The plea is in the nature of confession and avoidance. The avoidance — the insanity — is to be shown by the testimony. How can an expert give an intelligible opinion upon that point, or one that the jury would be justified in acting upon, unless the inquiry reflects the proof on that question? There must be a fair statement of *Page 508 
(623) the case to render the answer of any value whatever, as a partial statement or one founded on mere fiction, could not fail to mislead the jury, and probably cause a miscarriage of justice."
Besides, there was no evidence before the court of any fact or condition about which an expert could be expected to know any more than a man of average intelligence on the jury. The mere fact that the witness is an expert does not open the door for any and all opinions that he may care to express. Here there was not a scintilla of evidence that the prisoner's mind was ever diseased nor any suggestion of insanity in his family. There is no ground for the hypothetical question at all.
The exceptions to the charge can not be sustained. The judge properly told the jury that in no view of the evidence could they render a verdict of not guilty. There was no evidence tending to show self-defense. The judge did not err in instructing the jury that if the prisoner shot the deceased and killed her, and they were not satisfied beyond reasonable doubt, that the shooting and killing were the result of willful premeditation and deliberation, then the defendant was guilty of murder in the second degree. The prayers for the prisoner, which the court refused, were to the effect that "if the prisoner believed that the deceased was killing the child by choking the life out of it, he had the right to use such force as was necessary to save the life of the child, even if it was necessary to kill the deceased." As she was clinging to the child merely to prevent the prisoner from taking it from her, he could have secured the release of the child simply by desisting, and the prayer was properly refused. Though the prisoner testified that he did not intend to hit the deceased, he did not contradict the evidence that his pistol was so close that her clothes were scorched.
The jury might well have convicted of murder in the first degree. His Honor was also lenient in sentencing the prisoner to nine years in the State's prison. There was no prayer to present the phase of manslaughter to the jury, nor was there any exception for failure to do so. It was not raised by any phase of the evidence, nor could the defendant have received any prejudice, for the punishment imposed by the (624) court was less than half of that which could have been imposed upon a conviction for manslaughter. The case is notable for its abhorrent details, which present no justification for slaying, without provocation, a defenseless and fleeing woman, who had been the prisoner's wife.
No error. *Page 509